IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2024

## STATE OF TENNESSEE v. JERMAINE MITCHELL GRAY

**Appeal from the Circuit Court for Hardin County**
**No. 20-CR-79        J. Brent Bradberry, Judge**

_____

### No. W2023-01158-CCA-R3-CD
_____

The Appellant, Jermaine Mitchell Gray, appeals his conviction of the sale of 0.5 grams or more of methamphetamine for which he received a sentence of ten years' imprisonment. He argues: (1) the evidence is insufficient to support his conviction; (2) the State failed to reveal the existence and identity of a second confidential informant in violation of Brady v. Maryland, 373 U.S. 83 (1963); and (3) the trial court denied his right of allocution before sentencing. We additionally deny appointed counsel's July 18 motion to withdraw as counsel in this case. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Jamie L. Lowrance, Selmer, Tennessee, for the appellant, Jermaine Mitchell Gray.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Morgan B. Reynolds, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case stems from a controlled buy in which Agent Alex Davis provided a confidential informant, N.T., with one hundred and twenty dollars and instructed her to purchase drugs from the Appellant.[1] While recording using a cell phone, N.T. purchased a bag containing a white powdery substance from the Appellant. Later testing identified

---

[1] We will refer to the confidential informants by their initials.

the substance as 1.92 grams of methamphetamine. The Appellant was charged with the sale of 0.5 grams or more of methamphetamine. Tenn. Code Ann. § 39-17-434(a)(3).

At trial, Alex Davis, formerly a drug task force agent for the Twenty-Fourth Judicial District, testified that N.T. became a confidential informant to "work off" a criminal charge. After "working off" her charge, she continued to work as a confidential informant in exchange for payment. On October 8, 2018, he arranged a controlled buy in which N.T. purchased methamphetamine from the Appellant. B.I., another confidential informant, was with N.T. Agent Davis and another officer met with N.T. and B.I. at a secure location. They searched both informants and their vehicle before fitting them with audio and video equipment. They provided them with one hundred and twenty dollars to purchase the methamphetamine and told them the route to drive to the Appellant's location.

After the informants left the secure location, Agent Davis watched a live feed of the controlled buy. The live feed showed the Appellant selling the substance to the informants. The informants returned to the secure location. Agent Davis secured the substance and searched the informants and their vehicle. He did not find any additional drugs or money.

The recording of the live feed was admitted into evidence and played for the jury. At the beginning of the recording, an officer stated he was giving one hundred and twenty dollars to a confidential informant for a controlled buy from the Appellant. He provided the phone and money to the two informants. Shortly after, the camera was covered and remained covered for most of the drive to the location of the controlled buy. Music was playing loudly. The informants arrived at the location and entered an apartment. They approached a man and said, "one twenty," and he responded, "sure, sure, sure." They followed the man into the kitchen. He placed an item in one of their hands, though the item is not visible in the recording. The informants left the apartment. They returned to the vehicle, and the camera was again covered for a portion of the drive with the music playing loudly. The camera then remained on a bag containing a white powdery substance for most of the drive back to the secure location.

Agent Davis testified that he conducted a field test of the substance, which indicated it was methamphetamine. He then submitted the substance to the Tennessee Bureau of Investigation ("TBI") lab, which confirmed that the substance was 1.92 grams of methamphetamine. The TBI lab report was admitted into evidence.

On cross examination, Agent Davis testified that he believed the original charge N.T. was "working off" was fraud. He did not remember how much N.T. was paid in this case but estimated it was between one hundred and one hundred and fifty dollars. He acknowledged that he wrote in his report that he met with one informant, even though there were two. N.T. and B.I. were kind of "a package deal" because they were in a relationship.

B.I. was with N.T. for the majority of the controlled buys N.T. participated in, but B.I. was not being paid or "working off" charges.

Agent Davis said the recording of the controlled buy was created by a cell phone N.T. was holding. While the informants were driving to and from the Appellant's location, the camera was covered up for part of the time. The radio was also playing, so he could not hear what they were saying. He identified the Appellant as the man shown in the recording. Though the Appellant had a twin brother, he could tell the difference between them. He acknowledged that he did not search the informant's "underwear area" because the department's policy prohibited a male officer from doing so and they did not have any female officers in the city. Because he had worked with N.T. and B.I. before, they would have known how they were going to be searched.

N.T. testified that she became an informant because she was told her pending forgery and theft charges would be dismissed. She did approximately ten controlled buys, and her fiancé, B.I., was typically with her. On October 8, 2018, she was instructed to buy drugs from the Appellant, who sold methamphetamine out of his apartment and whom she knew as "Arab." She was paid one hundred dollars. When asked about the buy, she stated she did not remember "the actual going down." However, she never bought drugs from anyone other than the named target during controlled buys. Though Agent Davis searched her and B.I. after the controlled buy, she was "pretty sure" B.I. stole methamphetamine from the bag because they had methamphetamine the next day that they had not purchased. She said she was not receiving any benefit in exchange for her testimony. She did not want to testify because she feared potential repercussions and because she "[knew] people that [knew] [the Appellant]," and she did not believe he deserved to go to jail.

On cross-examination, N.T. said she was previously convicted of identity theft and possession of a schedule V drug with intent. She acknowledged that when she conducted the controlled buy in this case, she was using drugs. She also acknowledged she had "several" sexual encounters with the Appellant. She did not tell the police about these encounters because B.I. was always with her. She also testified that she had previously stayed at the apartment where she bought the methamphetamine from the Appellant. The apartment belonged to her son's father's aunt and was "the only place [she] was able to see [her] son." When asked how B.I. hid the methamphetamine while Agent Davis searched her, she responded that women "were born with a personal purse" that Agent Davis could not search. N.T. played the radio loudly so the officers could not hear her and B.I. talking and covered up the camera so B.I. could take some of the methamphetamine from the bag. She acknowledged she had no personal memory of buying drugs from the Appellant.

The jury convicted the Appellant as charged. The trial court conducted a sentencing hearing, during which the Appellant testified but did not make an allocution statement. He

did not express a desire to make an allocution statement, and the trial court did not ask whether he wished to do so. The trial court sentenced the Appellant to ten years' imprisonment. The Appellant filed an unsuccessful motion for new trial, and this timely appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence**. The Appellant argues that the evidence is insufficient to support his conviction because the State failed to establish: (1) that a sale occurred; and (2) the Appellant's identity as the perpetrator. He argues that the recording does not show an exchange and N.T. had no specific memory of the exchange. Regarding identity, he mentions that he has a twin brother but acknowledges that Agent Davis testified that he could distinguish between them. The State responds, and we agree, that the evidence is sufficient.

When evaluating the sufficiency of the evidence, this court must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Because a guilty verdict removes the presumption of innocence and imposes a presumption of guilt, the Appellant bears the burden of showing why the evidence is insufficient to support the verdict. Id. (citing State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury evaluates the credibility of witnesses, determines the weight given to their testimony, and reconciles all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Tennessee Code Annotated section 39-17-434(a)(3) provides that "[i]t is an offense for a defendant to knowingly . . . sell methamphetamine." "[A] sale consists of two components: a bargained-for offer and acceptance, and an actual or constructive transfer or delivery of the subject matter property." State v. Holston, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002) (citing State v. Wilkerson, No. 03C01-9708-CR-00336, 1998 WL 379980, at *3 (Tenn. Crim. App. July 9, 1998)). "One who accepts payment in exchange for property is involved in a sale." Id. (citing Wilkerson, 1998 WL 379980, at *3). When the amount of methamphetamine sold is 0.5 grams or more, the offense is a Class B felony. Tenn. Code Ann. §§ 39-17-434(e)(1), 39-17-417(c)(1).

- 4 -

In addition to the statutory elements, "[t]he identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. State v. Thomas, 158 S.W.3d 361, 387 (Tenn. 2005). The identification of the defendant as the perpetrator is a question for the trier of fact after considering all the relevant proof. Id. at 388.

Viewed in the light most favorable to the State, the evidence is sufficient to support the Appellant's conviction. Agent Davis testified that he arranged for N.T. to purchase drugs from the Appellant. According to N.T., she had previous sexual encounters with the Appellant and was therefore familiar with him. Agent Davis provided N.T. with one hundred and twenty dollars and a cell phone to record the exchange. The recording shows N.T. arriving at the apartment and approaching a man. She stated, "one twenty," which constituted an offer, and he responded, "sure, sure, sure," which constituted an acceptance. She then gave the money to the man, and he placed an item in her hand. Though the item is not visible in the recording, N.T. returned with a bag containing a white powdery substance that the TBI confirmed was 1.92 grams of methamphetamine. Agent Davis confirmed that the man in the recording was the Appellant and specifically stated that he could distinguish between the Appellant and his twin brother. Though N.T. testified that she had no specific memory of the exchange, she confirmed that Agent Davis directed her to buy drugs from the Appellant and that she never bought drugs from anyone other than the named target during controlled buys. This evidence established that the Appellant sold 1.92 grams of methamphetamine to N.T., and the Appellant is therefore not entitled to relief.

**II. Brady Violation.** The Appellant argues the State committed a Brady violation by failing to reveal the existence and identity of a second confidential informant, B.I. He contends that Agent Davis excluded mention of B.I. from his report and wrote that he met with "a confidential informant" to conceal her participation. Because of this intentional exclusion, the Appellant did know about her participation until trial. According to the Appellant, B.I.'s testimony "would directly contradict [the testimony of] Agent Davis, [N.T.], or possibly both." The State responds that the Appellant has waived his claim by failing to raise it at trial or in his motion for new trial. The State argues the Appellant is not entitled to plain error relief because he has not requested it and because he has not shown a breach of a clear and unequivocal rule of law.

We note that the Appellant did not frame this issue as a Brady violation in his motion for new trial; however, he did argue that the State failed to disclose this witness prior to trial. We conclude that the issue is waived because, though it was raised in the motion for new trial, it was not raised before or during trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take

whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Shumacker, No. E2019-01297-CCA-R3-CD, 2021 WL 684877, at *9 (Tenn. Crim. App. Feb. 23, 2021), perm. app. denied (Tenn. June 9, 2021) (concluding that the Appellant waived his Brady issue by failing to raise it in the trial court or in his motion for new trial). Though it is within this court's discretion to address waived errors under the plain error doctrine, we decline to exercise such discretion in this case. See Tenn. R. App. P. 36(b). The Appellant failed to request plain error review and failed to file a reply brief responding to the State's waiver argument. See State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief."). Accordingly, we conclude that the Appellant has waived this issue and is not entitled to relief.

**III.** **Right of Allocution**. The Appellant argues he was denied his right of allocution before sentencing because the trial court failed to inquire whether he wished to provide an allocution statement. The State responds, and we agree, that the trial court was not required to inquire whether the Appellant wished to provide an allocution statement.

An allocution statement is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." State v. Keathly, 145 S.W.3d 123, 125 (Tenn. Crim. App. 2003) (quoting Black's Law Dictionary 75 (7th ed. 1999)). Tennessee Code Annotated section 40-35-210(b)(7) allows for such a statement. Section 40-35-210(b)(7) provides that in determining a defendant's sentence, the court shall consider "[a]ny statement the defendant wishes to make on the defendant's own behalf about sentencing." It does not, however, impose on the trial court an affirmative duty to inquire whether the defendant wishes to provide an allocution statement. See, e.g., Buchanan v. State, No. M2022-00190-CCA-R3-PC, 2023 WL 3476879, at *12 (Tenn. Crim. App. May 16, 2023), no perm. app. filed; Johnson v. State, No. M2014-01419-CCA-R3-PC, 2015 WL 832328, at *4 (Tenn. Crim. App. Feb. 26, 2015) ("Although a trial court's refusal to allow allocution is reversible error, trial courts are not required to inquire whether the defendant wishes to make any such statement."), perm. app. denied (Tenn. June 15, 2015); State v. Crawford, No. E2012-00001-CCA-R3-CD, 2013 WL 4459009, at *27 (Tenn. Crim. App. Aug. 19, 2013), no perm. app. filed (denying relief because though the trial court "did not specifically ask the Defendant if he wished to allocute, [it] did not deny the Defendant the opportunity to do so").

The Appellant was not denied his right of allocution because he had the opportunity to make an allocution statement. The Appellant relies solely on State v. Tucker, wherein

this court concluded that the defendant was denied her statutory right of allocution when, after expressing her desire to allocate rather than testify, "the [d]efendant was placed under oath, read her statement, and was cross-examined by the prosecutor." No. W2019-01368-CCA-R3-CD, 2020 WL 9171957, at *1, *5 (Tenn. Crim. App. Nov. 25, 2020), perm. app. denied (Tenn. Apr. 8, 2021). In this case, however, the Appellant did not express a desire to allocate. Though the trial court did not specifically ask the Appellant whether he wished to make an allocution statement, it did not prevent him from doing so. See Crawford, 2013 WL 4459009, at *27. Accordingly, the Appellant is not entitled to relief.

Finally, we acknowledge that on July 18, 2024, appointed counsel filed a motion to withdraw with an attached memorandum of law. Tenn. Sup. Ct. R. 13, § 1(e)(5) ("Appointed counsel shall continue to represent an indigent party throughout the proceedings, including any appeals, until the case has been concluded or counsel has been allowed to withdraw by a court."). As grounds, counsel asserted a conflict of interest based on Tennessee Supreme Court Rule 8, Rules of Professional Conduct 1.6(b)(1), 1.7(a)(2), and 1.16(a)(1). The motion to withdraw further asserted that counsel had consulted with the Tennessee Board of Professional Responsibility and "discussed the specifics of the situation" as provided for by the Rules and was advised to seek permission to withdraw for cause. However, neither the motion to withdraw nor the attached memorandum assert any facts in support of counsel's purported conflict of interest.

In addressing the motion to withdraw as counsel, we note that it was filed well after the briefing in this matter was complete and almost simultaneously with the filing of the opinion affirming the Appellant's conviction. Under Court of Criminal Appeals Rule 12, counsel will only be allowed to withdraw for good cause shown and if application is made to this Court when counsel is not delinquent in his or her duties. Although Counsel is not delinquent in his duties, he has not provided this Court with any facts upon which to grant his motion, and nothing presently before this Court establishes an actual conflict of interest or any other basis that would allow either mandatory or permissive withdrawal of counsel. See State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993); State v. Street, 768 S.W.2d 703, 708 (Tenn. Crim. App. 1988).

That said, appointed counsel's remaining obligations to the Appellant are limited to compliance with the requirements of Tennessee Supreme Court Rule 14. Upon review of this opinion and given the purported conflict of interest, if counsel determines he is unable to pursue discretionary second tier review, he must provide written notification to the Appellant of his withdrawal and the Appellant's ability to proceed pro se. Rule 14 further requires counsel to file a motion to withdraw within fourteen (14) days of this opinion:

> The motion shall state that: (1) based upon counsel's review of the opinion
> of the intermediate appellate court, the brief filed on behalf of the indigent

party in that court presents such issues as are available for second-tier appellate review if sought by the party acting pro se, and (2) the written notification prescribed by this Rule and a copy of the intermediate court's opinion have been forwarded to the indigent party.

The motion shall be accompanied by a copy of the written notification forwarded to the indigent party. The written notification shall state: (1) that counsel does not intend to file an Application for Permission to Appeal and that counsel is asking the intermediate court for permission to withdraw; (2) that the party may file a pro se Application for Permission to Appeal with the Clerk of the Supreme Court if filed within sixty (60) days after entry of final judgment in the intermediate appellate court; (3) the date on which the intermediate court's opinion was released; and (4) the date on which an Application for Permission to Appeal is due. The written notification must also reflect the party's mailing address to which the notice was forwarded.

Tenn. Sup. Ct. R. 14.

Accordingly, the motion to withdraw as counsel is DENIED, pending compliance with Rule 14 of the Tennessee Supreme Court Rules.

## CONCLUSION

Based on the foregoing reasons and authority, we affirm the trial court's judgment.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE